IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| GEORGE HENGLE AND <br> SHARON NADEAU, <br> <br> Plaintiffs, <br> <br> v. <br> <br> WLCC II; WAKPAMNI LAKE COMMUNITY <br> CORPORATION; GENEVA LONE HILL; <br> RAYCEN RAINES; AND JOHN DOE NOS. 1-10; <br> <br> Defendants. | : <br> : <br> : Civil Action No. 18-818 <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |

## CLASS ACTION COMPLAINT

COME NOW Plaintiffs, George Hengle and Sharon Nadeau ("Plaintiffs"), by counsel, and for their Class Action Complaint against Defendants, they allege as follows:

### INTRODUCTION

1. In an attempt to circumvent state usury, payday lending, and consumer fraud statutes, Defendants Raycen Raines, Geneva Lone Hill and others unknown to Plaintiffs, operated several criminal enterprises to market and collect illegal "payday" loans. The scheme was designed to violate the usury and payday lending laws of multiple states while ostensibly shielding the Defendants from liability through a business structure that attempted to exploit Native American sovereign immunity.

2. To facilitate their blatant violations of state interest-rate lending laws, Defendants helped form the WLCC II and Wakpamni Lake Community Corporation (collectively the "WLCC"), which claim to be political subdivisions of the Oglala Sioux Tribe (the "Tribe"). In reality, these entities were formed by several *rogue members* of Tribe for the purpose of serving

as a "rent-a-tribe" scheme to facilitate the efforts of non-tribal companies to make loans in excess of 800%. Even though the Tribe rejected the business venture in 2011, Defendants nonetheless started the WLCC and proceeded to make high-interest loans through various websites branded as owned and operated by the WLCC. *See, e.g.*, Nicholas Nehamas, *The Tribe That Said No: How One Rogue Tribal Member Tried to Drag the Oglala Sioux Into Payday Lending,* Al Jazeera America (June 18, 2014).[1] Because Defendants could not get the Tribe to participate in their scheme, WLCC holds itself out as an "political subdivision" of the Tribe even though the Tribe does not participate in any of the business functions of the WLCC and does not receive any of the profits from the illegal scheme.

3. Defendants further claim that this purported immunity extends to the internet payday lending companies operated by third parties because the WLCC allows these companies to use WLCC's name as a front and, in return, receives a small fee for each loan. Upon information and belief, the small fee generated for use of the WLCC's name is retained by the rogue members who formed WLCC, including Raycen Raines and Geneva Lone Hill.

4. WLCC has allowed its name to be used by no less than 14 internet payday lending companies, including Arrow Head Advance, Green Circle, The Gan Eden Group, First Day Loan, Fox Hills Cash, Rolling Plains Cash, Check Advance USA, Cash on Cloud9, Easy Cash Online Store, Bayside Cash, Fast Money Store, Fireside Cash, Seaside Dollar, and Seaside Payday. WLCC allows each of these companies to falsely claim that they are "wholly-owned" and "controlled by" WLCC. In reality, each of these companies are owned and controlled by non-tribal members who reap all of the proceeds from the unlawful loans.

---

[1] Available at http://projects.aljazeera.com/2014/payday-nation/sioux-tribe-pay.html.

5. This lawsuit challenges WLCC's claim of sovereign immunity as "an arm of the tribe" and seeks to disgorge the unlawful profits made by the WLCC, its members, any third parties and their principals, who run all aspects of the lending business off tribal lands and without tribal involvement, including underwriting, funding, and collection of the loans. Plaintiffs were each victims of Defendants' scheme. Each of the Plaintiffs entered into a Loan Agreement with one of the internet websites claimed to be "wholly owned" and "controlled by" the WLCC. Each of the Loan Agreements charged interest in excess of 450% (often in excess of 700%) in blatant disregard of Virginia's usury laws.

6. Based on Defendants' conduct, Plaintiffs allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), which prohibits any person employed by or associated with an enterprise from collecting "unlawful debt." RICO defines "unlawful debt" as a debt incurred in "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6). Defendants acted in concert with each other to repeatedly violate Virginia's usury laws and collected unlawful debts from Plaintiffs and the putative class members.

7. Plaintiffs also allege a class claim pursuant to Virginia's usury and licensing laws, which prohibit any company from making such loans to Virginians in excess of 12% APR unless that company has obtained a consumer finance license from the Virginia State Corporation Commission. *See* Va. Code § 6.2-1541(A). Such loans are null and void and the lender or any third-party may not collect, obtain or receive any principal, interest, or charges whatsoever on said loans. Accordingly, Plaintiffs seek to disgorge all payments made by Virginia consumers to Defendants. Plaintiffs further seek a declaratory judgment, on behalf of themselves and all others similarly situated, that any Loan Agreement connected to the WLCC is void and unenforceable

under Virginia law pursuant to Virginia Code § 6.2-1541(A) and, to that end, Plaintiffs further seek an injunction against Defendants that prohibits them from collecting on these loans and requiring them to provide notice to all class members that their loans are unenforceable.

## JURISDICTION

8. This Court has jurisdiction pursuant to 18 U.S.C. § 1965 and 15 U.S.C. § 1692k(d). The Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. §§ 1367 and 1332(d)(2).

## PARTIES

9. Plaintiffs George Hengle is a natural person who resides in Virginia and in this District and Division.

10. Plaintiffs Sharon Nadeau is a natural person who resides in Virginia.

11. Defendants WLCC II and Wakpamni Lake Community Corporation (collectively "WLCC") are two privately held corporations formed by Raycen Raines and Geneva Lone Hill, which operate without approval from and provides no benefit to the Tribe. In return for a small fraction of the profits, WLCC allows internet payday lending websites to use its name and falsely claim that they are "pollical subdivisions" of the Tribe. In reality, the Tribe does not participate in the day-to-day operations of the payday lending websites and does not perform any of the work in originating, underwriting or financing the loans. Instead, the day-to-day operations are performed by non-tribal third parties, who provide a kickback to Raines and the others involved in order to create the appearance that the loans are protected by sovereign immunity.

12. Defendant Raycen Raines ("Raines") is a natural person who was born in Portland, Oregon. In 2011, Raines moved to the Pine Ridge Reservation, which is the land in South Dakota that is home to the Tribe. At all times relevant hereto, Raines was the "matchmaker," *i.e.*, the

4

middleman who brought together non-tribal members with the rogue members of the Tribe to establish the WLCC, which operates without approval from and provides no benefit to the Tribe. Raines handles the relationship between the WLCC and the internet lending websites. Upon information and belief, Raines receives a percentage of the profits from the illegal loans for his role as the middleman.

13. Defendant Geneva Lone Hill ("Hill") is the president of the WLCC. She is one of the rogue members of the Tribe who helped form the WLCC. Upon information and belief, Hill receives a percentage of the profits from the WLCC.

14. Defendant John Doe Nos. 1-10 are unidentified parties who participated in the enterprise with the Defendants.

## FACTS

### A. Overview of Defendants' Enterprise.

15. Over the last decade, businesses have sought to evade state lending laws by entering into ventures with Native American tribes to shield the businesses through use of tribal sovereign immunity. *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2052, 188 L. Ed. 2d 1071 (2014) (Scalia, J., dissenting) ("payday lenders (companies that lend consumers short-term advances on paychecks at interest rates that can reach upwards of 1,000 percent per annum) often arrange to share fees or profits with tribes so they can use tribal immunity as a shield for conduct of questionable legality." (citing Martin & Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk*? 69 WASH. & LEE L. REV. 751, 758–759, 777 (2012)).

16. In order to continue doing business and evade state usury laws, several payday lenders teamed up with Raines, a former insurance salesman originally from Oregon, who has Oglala lineage and moved to the Pine Ridge Reservation in 2011.

17. Although Raines is an enrolled member of the Tribe, he is not a tribal official and does not represent or act on behalf of the Tribe.

18. In January 2012, Raines approached members of the Wakpamni District—one of the nine subdivisions of the Pine Ridge Reservation—with a business opportunity to enter the internet payday lending market.[2]

19. During a meeting in January 2012, Raines presented members of the Wakpamni District with a proposed partnership agreement to do business with a payday lender named Cash Cloud.

20. As compensation for its role in the deceptive scheme, Cash Cloud would pay the Wakpamni District $5 per new loan initiated by Cash Cloud with a net minimum payment of $100,000 per month.

21. Under the proposed partnership agreement, the proceeds would be paid into a bank account held by Raines, who would remit 50% of the proceeds to the Wakpamni District.

22. Ultimately, the Wakpamni Board rejected the business venture, but Raines set up the WLCC with a few rogue members of the Wakpamni district and proceeded to make the loans without the Tribe's permission.

---

[2] A portion of the factual allegations are taken from Al Jazeera America's investigation into Raines and the WLCC, as well as other lawsuits and government enforcement actions against similar tribal lending schemes.

23. Although the WLCC holds itself out as the actual lender of these internet payday loans, non-tribal members not yet known to Plaintiffs, performed the underwriting requirements, funded the loans, and controlled all aspects of the servicing after the initiation of the loan.

24. Because the Tribe has no ownership interest in the business, WLCC erroneously holds itself out as an "arm and instrumentality" and "political subdivision" of the Tribe even though the Tribe does not participate in any of the business functions of the WLCC and does not receive any of the illegal profits from the scheme.

25. Aside from Cash Cloud, the WLCC has allowed its name to be used by no less than 14 internet payday lending companies, including Arrow Head Advance, Green Circle, The Gan Eden Group, First Day, Fox Hills Cash, Rolling Plains Cash, Check Advance USA, Cash on Cloud9, Easy Cash Online Store, Bayside Cash, Fast Money Store, Fireside Cash, Seaside Dollar, and Seaside Payday (collectively "Defendants' Payday Lending Companies").

26. Upon information and belief, WLCC entered into a partnership agreement with each of the Defendants' Payday Lending Companies and each of the individual Defendants executed at least one of the partnership agreements.

27. Upon information and belief, non-tribal third parties controlled all aspects of Defendants' Payday Lending Companies claimed to be "wholly owned" and "controlled by" the WLCC, including the call centers, the loan software, the advertising, and the servicing of the loans.

28. Upon information and belief, the Payday Lending Companies often shared employees, computer systems, and other operating costs—none of which were paid by the WLCC or the Tribe.

29. Upon information and belief, the WLCC had no control over the income or expenses of any of the Defendants' Payday Lending Companies and no entitlement to the profits of the companies except for the nominal, flat-fee paid to the WLCC.

30. In other words, the WLCC allows these companies to use WLCC's name as a front and, in return, receives a small fee for each loan.

31. Upon information and belief, the small fee generated for use of the WLCC's name is retained by the rogue members who formed WLCC, including its president, Defendant Hill.

32. Upon information and belief, no member of the Tribe or the Wakpamni subdivision participates in the day-to-day operations of the payday lending companies and all such activities occur off the Pine Ridge Reservation.

33. Moreover, all activities performed on behalf of the payday lending companies are performed by employees not located on the Pine Ridge Reservation—often located in Kansas, Utah, or Florida.

34. Upon information and belief, the money loaned to Plaintiffs was transferred from a bank account owned and operated or controlled by non-tribal third parties not yet known to Plaintiffs who have no connection to the Tribe or Pine Ridge Reservation.

35. In the past few years, federal regulators have begun cracking down on rent-a-tribe arrangements.

36. For example, the United States Attorney for the Southern District of New York has indicted Scott Tucker and Timothy Muir, competitors of Defendants, for engaging in exactly the same unlawful-lending "rent a tribe" and collection practices alleged herein.

37. The Tucker indictment, which sets out a strikingly similar set of facts, includes: (1) Mr. Tucker, through the use of shell companies, personally lent money to thousands of consumers

through payday loans; (2) Tucker personally controlled virtually every aspect of the operations of these sham entities; (3) these sham entities shared employees, computer systems, and "other operating costs and infrastructure of a single lending business"; and (4) Mr. Muir acted as general counsel for one of the Tucker entities. *United States v. Tucker*, Case No. 16-crim-091 (S.D. N.Y. Feb. 9, 2016) (Doc. 1 at ¶¶ 1–3).

  38. For example, the indictment explains:

> In truth and in fact, as SCOTT TUCKER and TIMOTHY MUIR, the defendants, well knew, while TUCKER and MUIR took steps to create the sham appearance of tribal ownership and control of the Tucker Payday Lenders, Tribes 1–3 played no substantive role in the ownership or operation of the Tucker Payday Lenders at any time. To create the sham appearance of ownership, TUCKER assigned nominal ownership of the Tucker Payday Lenders to Tribes 1-3 (that is, Ameriloan, United Cash Loans, US Fast Cash, Advantage Cash Services and Star Cash Processing were assigned to Tribe 1, One Click Cash was assigned to Tribe 2, and 500 Fast Cash was assigned to Tribe 3), and from time to time caused Tribes 1-3 to appear as the businesses' owners on certain corporate and financial documents. However, in truth and in fact, at all relevant times, and as TUCKER and MUIR well knew, Tribes 1-3 had no power to make any decisions on behalf of any of the Tucker Payday Lenders, no control over the income or expenses of any of the Tucker Payday Lenders, and no entitlement to the Tucker Payday Lenders' profits.
>
> Similarly, to create the sham appearance that Tribes 1–3 not only owned, but operated, the Tucker Payday Lenders, SCOTT TUCKER, the defendant, caused members of two of the tribes (Tribe 1 and Tribe 2) to have a tribal member press a key on a computer on a daily basis on tribal lands to purportedly "approve" the extension of credit on hundreds or thousands of loans that the Tucker Payday Lenders, through their approximately 600 employees in Kansas, had in fact already approved and agreed to provide to customers. TUCKER did not require a third tribe that purportedly owned and operated one of the Tucker Payday Lenders (Tribe 3) to engage in this sham participation in the operations of his business at all.

*Id*. at ¶¶ 23-24.

39. On October 13, 2017, a jury convicted Tucker and Muir. *United States v. Tucker*, Case No. 16-crim-091 (S.D. N.Y.).[3]

40. Just like the Tucker defendants, Defendants' business relationship with the Tribe was nothing more than an attempt to mislead consumers and regulators by an illusion that Defendants were protected by tribal immunity.

### B. Defendants' Loans Charged Interest in Violation of Virginia Code § 6.2-1541 and RICO.

41. Defendants, and others not yet known to Plaintiffs, through Defendants' Payday Lending Companies, marketed WLCC internet loans to Virginians.

42. Under the terms of the standard Loan Agreements, the interest rates charged were significantly greater than 12% APR.

43. Defendants charged Mr. Hengle with an annual percentage rate ("APR") of 769.5%. *See* Nov. 8, 2016 Loan Agreement, attached as Ex. 1.

44. Similarly, Defendants charged Ms. Nadeau with an APR of 769.5%.

45. Section 6.2-1541 of the Virginia Code prohibits any person from making such loans to Virginians in excess of 12% APR unless that company has obtained a consumer finance license from the Virginia State Corporation Commission. *See* Va. Code § 6.2-1501.

46. Neither the WLCC nor Defendants' Payday Lending Companies had a consumer finance license when they made these loans to the Plaintiffs who were located in Virginia; and they never have had or attempted to obtain such a license.

---

[3] *See* The United States Attorney's Office, Southern District of New York, *Scott Tucker Sentenced To More Than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise* (Jan. 8, 2018).

10

47. Under Va. Code § 6.2-1541(A), if a lender was not exempt from the provisions of those statutes and had not obtained a consumer finance license, yet nonetheless contracted to make a consumer loan, and charged, contracted for, or received, interest or other compensation in excess of 12% per year, then the loan was and is null and void and the lender is not able to collect, obtain or receive any principal, interest or charges whatsoever on said loan.

48. Upon information and belief and as evidenced by each of the loans made to Plaintiffs, all of Defendants' loans to consumers located in Virginia contained interest rates over 12% per year even though Defendants did not obtain a consumer finance license.

49. Accordingly, Defendants' loans were null and void and it is unlawful for Defendants or any their affiliated entities to collect or receive any principal, interest or charges whatsoever on said loans, including the amounts paid by each of the Plaintiffs.

50. Defendants received no less than $2,387 from Ms. Nadeau as a result of her illegal loan.

51. Defendants received no less than $366.95 from Mr. Hengle as a result of his illegal loan.

52. Pursuant to Va. Code § 6.2-1541(A), Plaintiffs and the class members are entitled to recover the principal and fees collected on their loans, as well as twice the amount of interest pursuant to Va. Code § 6.2-305.

53. Based on this conduct, Defendants also violated § 1962(c) of RICO, which prohibits the "collection of unlawful debt." 18 U.S.C. § 1962(c).

54. RICO defines "unlawful debt" as a debt that was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

55. As reflected by Plaintiffs' Loan Agreements, Defendants charged an interest rate far in excess of the enforceable rate established by Va. Code § 6.2-1541(A), and, thus, Defendants violated RICO's prohibition against the collection of unlawful debt.

56. As a result of Defendants' participation in the enterprise and violations of RICO, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorneys fees pursuant to 18 U.S.C. § 1964(c).

## COUNT ONE:
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

57. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

58. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as:

> All Virginia residents who: (1) executed a loan with Defendants' Payday Lending Companies or any other entity affiliated with the WLCC; (2) where the loan was originated and/or any payment was made on or after November 25, 2014.

Plaintiffs are members of this class.

59. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants and the class members may be notified of the pendency of this action by published and/or mailed notice.

60. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no

factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members.

61. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

62. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class, because their interests coincide with, and are not antagonistic to, the interests of the members of the Class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the Class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

63. **Injunctive Relief Appropriate for the Class. Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the Class, making appropriate equitable injunctive relief with respect to Plaintiffs and the Class members. Plaintiffs and the putative class seek an injunction ordering the Defendants to divest themselves of any interest in any enterprise pled herein, including the receipt of racketeering profits; prohibiting the Defendants from continuing to engage in any enterprise pled herein; and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein.

64. As alleged above, Defendants, along with other participants not yet known to Plaintiffs, violated § 1962(c) of RICO through the "collection of unlawful debt." 18 U.S.C. § 1962(c).

65. RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

66. All of the loans made to Virginia residents by Defendants and their affiliated companies included an interest rate far in excess of twice the enforceable rate in Virginia.

67. This conduct began sometime as early 2012 and continues to date and will be repeated again and again in the future to the detriment of Virginia consumers.

68. Plaintiffs and the putative class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c) and are entitled to treble their actual damages, which would include any interest, fees or other sums collected by Defendants.

69. As a result of Defendants' participation in the enterprise and violations of RICO, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorneys fees pursuant to 18 U.S.C. § 1964(c).

## COUNT TWO:
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

70. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

71. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class, initially defined as:

> All Virginia residents who: (1) executed a loan with Defendants' Payday Lending Companies or any other entity affiliated with the WLCC; (2) where the loan was originated and/or any payment was made on or after November 25, 2014.
>
> Plaintiffs are members of this class.

72. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants and the class members may be notified of the pendency of this action by published and/or mailed notice.

73. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members.

74. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

75. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class, because their interests coincide with, and are not antagonistic to, the interests of the members of the Class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the Class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

76. **Injunctive Relief Appropriate for the Class. Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the Class, making appropriate equitable injunctive relief with respect to Plaintiffs and the class members. Plaintiff and the putative class seek an injunction ordering the Defendants to divest

themselves of any interest in any enterprise pled herein, including the receipt of racketeering profits; prohibiting the Defendants from continuing to engage in any enterprise pled herein; and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein.

77. As alleged above, Defendants, along with other participants not yet known to Plaintiffs, violated § 1962(d) of RICO as evidenced, in part, by the series of agreements to violate § 1962(c), including the partnership agreement entered into between the WLCC and the Payday Lending Companies.

78. As explained above, Defendants knowingly agreed facilitate the illegal lending scheme, which blatantly violates § 1962(c) of RICO.

79. Plaintiffs and the class members suffered actual damages as a result of Defendants' violations of 18 U.S.C. § 1962(d).

80. As a result of Defendants' participation in the enterprise and violations of RICO, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorneys fees pursuant to 18 U.S.C. § 1964(c).

## COUNT THREE:
## VIOLATIONS OF VIRGINIA USURY
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

81. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

82. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Virginia Usury Class"—initially defined as:

> All Virginia residents who: (1) executed a loan with Defendants' Payday Lending Companies or any other entity affiliated with the WLCC; (2) where the loan was originated and/or any payment was made.

Plaintiffs are members of this class.

83. **<u>Numerosity</u>. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants and the class members may be notified of the pendency of this action by published and/or mailed notice.

84. **<u>Predominance of Common Questions of Law and Fact</u>. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the loans made by Defendants violated Virginia Code Section 6.2-1501 because their interest levels were too high; and (2) whether Plaintiffs and class members are entitled to recover the total amount of interest paid, plus twice the amount of interest paid during the two years preceding this lawsuit, along with reasonable attorneys' fees and costs under Virginia Code § 6.2-305?

85. **<u>Typicality</u>. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

86. **<u>Adequacy of Representation</u>. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class, because their interests coincide with, and are not antagonistic to, the interests of the members of the Class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of

the members of the Class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

87. **Injunctive Relief Appropriate for the Class. Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the Class, making appropriate equitable injunctive relief with respect to Plaintiffs and the class members.

88. The dispute and controversy is a justiciable matter which is not speculative, and a resolution by this court will determine the rights and interests of the parties to the Loan Agreements as well as the validity, if any, of the subject loans.

89. Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity of the forum-selection and arbitration clauses in the Loan Agreements.

90. All of the loans that Defendants' Payday Lending Companies made to Virginia residents included an interest rate greater than 12%.

91. None of the exceptions to and within Va. Code ¶6.2-303 apply.

92. Plaintiffs and the putative class members are entitled to recover from Defendants an amount equal to the total amount of interest paid in excess of 12%, plus twice the amount of such usurious interest that was paid in the two years preceding the filing of this action and their attorneys' fees and costs. Va. Code § 6.2-305(A).

93. Plaintiffs and the putative class members are entitled to a declaratory judgment that they are not indebted to WLCC and/or Defendants' Payday Lending Companies.

94. Defendants have acted on grounds that apply generally to the class in attempting to collect debts that are void and unenforceable.

95. Accordingly, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully move for entry of an injunction prohibiting Defendants from making loans in excess of 12% or collecting on debts from Virginia consumers that are associated with the WLCC.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs request that the Court enter judgment on behalf of themselves and the classes they seek to represent against Defendants as follows:

A. Certification for this matter to proceed as a class action under Fed. R. Civ. P. 23(b)(2) and 23(b)(3);

B. Declaratory, injunctive and damages relief as pled herein;

C. Attorney's fees, litigation expenses and costs of suit; and

D. Such other or further relief as the Court deems proper.

**TRIAL BY JURY IS DEMANDED**

                                      Respectfully submitted,
                                      **GEORGE HENGLE AND SHARON NADEAU**

                                      /s/ *Andrew J. Guzzo*
                                      Kristi C. Kelly, Esq., VSB #72791
                                      Andrew J. Guzzo, Esq. VSB # 82170
                                      Casey S. Nash, Esq. VSB#84261
                                      KELLY & CRANDALL, PLC
                                      3925 Chain Bridge Road, Suite 202
                                      Fairfax, VA 22030
                                      Telephone: 703-424-7576
                                      Facsimile: 703-591-0167
                                      Email: kkelly@kellyandcrandall.com
                                      Email: aguzzo@kellyandcrandall.com
                                      Email: casey@kellyandcrandall.com
                                      *Counsel for Plaintiffs*